Matter of State of New York v J.T. (2026 NY Slip Op 50026(U))

[*1]

Matter of State of New York v J.T.

2026 NY Slip Op 50026(U)

Decided on January 9, 2026

Supreme Court, Queens County

Watters, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 9, 2026
Supreme Court, Queens County

In the Matter of the Application of The State of New York, FOR CIVIL COMMITMENT PERSUANT TO ARTICLE 10 OF THE MENTAL HYGIENE LAW

againstJ.T., Respondent.

SMZ-71216/2021

For the Petitioner: Letitia James, Esq., New York Attorney General 
(Anthony Miller, Esq., and Andrew Fukuda, Esq.)
For the Respondent: Mental Hygiene Legal Services
(Peter J. Scheidt, Esq., and Brett Potash, Esq.)

Joanne B. Watters, J.

After a jury trial, Respondent J.T. was found to be a detained sex offender who suffers from a mental abnormality. Following that verdict, on October 9, 15, 16, 23, 24, and November 3, 2025, this Court held a dispositional hearing pursuant to Article 10 of the Mental Hygiene Law. The question before the Court is whether Respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision and treatment. Dr. Pola Eisenstein-Rosan and Dr. John Thomassen testified for the Petitioner. Dr. Leonard Bard, B.M. (Mother of Respondent), M.M. (Stepfather of the Respondent), and T.M. (Brother of the Respondent) testified on behalf of the Respondent. This Court credits the testimony of the witnesses.
Petitioner's CaseDr. Pola EisensteinRosan
Dr. Pola Eisenstein-Rosan has served as psychiatric examiner with the Office of Mental Health since 2012 and works exclusively on Mental Hygiene Law Article 10 cases. She was accepted as an expert in forensic psychology for the purposes of this dispositional hearing.
Dr. Eisenstein-Rosan diagnosed the Respondent with other specified personality disorder with antisocial and narcissistic personality traits, mild alcohol use disorder, and severe cannabis use disorder. She reviewed Respondent's records to assess whether he meets the criteria for a dangerous sex offender requiring confinement, and she utilized the Static-99R, an actuarial instrument that estimates baseline risk for sexual recidivism. The Static-99R is routinely used and accepted by professionals in the field of psychology to determine the risk of sexual recidivism of an individual being released into the community. Respondent received a score of [*2]seven, placing him in the well-above-average risk of re-offending category.[FN1]
A score of seven corresponds to an estimated five-year sexual recidivism risk of 21% to 26% and a ten-year risk of 27% to 38%.
In addition to the Static-99R, Dr. Eisenstein-Rosan evaluated meaningful dynamic risk factors. Unlike the Static-99R, which assesses an individual's historical factors, remains generally unchanged over time, and yields a fixed numerical score, the dynamic risk factors assess traits, behaviors, and attitudes that are subject to change or improvement and do not result in a single numerical value.[FN2]

Based on the Respondent's records that were available to the doctor, she considered the meaningful dynamic risk factors that did apply or may apply.
The first factor that she found may apply was sexual preoccupation or abnormal sexual interest. Respondent committed four sexual offenses over a short period of time beginning at age seventeen, reported infidelity with prostitutes during a long-term relationship, and reported having approximately fifty sexual partners. She noted, however, that there was no evidence of inappropriate sexual behavior or disciplinary tickets for sexual misconduct while Respondent was incarcerated in DOCCS or housed at STARC-Oakview ("STARC").
Dr. Eisenstein-Rosan also considered offense-supportive attitudes, defined as beliefs that minimize accountability by shifting blame to victims. She testified that this factor may apply because Respondent stated that all his victims were "auditioning" to become prostitutes and attributed approximately forty percent of the responsibility for his offenses to them.
The doctor further assessed Respondent's capacity for emotionally intimate adult relationships. She testified that this factor applied because Respondent has never been married or cohabitated with a partner. She noted that his infidelity caused distress in a long-term relationship, suggesting relational conflict, although she acknowledged that her information on this issue was limited.
Dr. Eisenstein-Rosan identified lifestyle impulsivity as a factor that applied. While in DOCCS and at STARC, Respondent used prohibited substances, including marijuana, synthetic cannabinoids (K2), and PCP. According to Dr. Eisenstein-Rosan, the use of cannabis can increase libido/sexual pleasure and, thus, aggression, impulsivity, and poor decision making. PCP is a hallucinogenic, which can cause bizarre behavior. She testified that Respondent continued to make reckless and irresponsible decisions despite sanctions. As an example, she described a 2025 incident in which Respondent, upset over the closure of a restroom, obtained a bucket, pulled down his pants, and sat over the bucket as if to defecate, though he did not do so. She characterized this conduct as impulsive and reckless. She further testified that Respondent had "red dots" which indicates that the inmate can become out of control. Finally, Respondent claimed his sexual offenses were unplanned and that he "went with the flow."
Dr. Eisenstein-Rosan also found evidence of poor cognitive problem-solving skills, including deficits in consequential thinking. She noted that Respondent lured a female from her apartment so that she could be assaulted by others and that he possessed and used illegal substances while incarcerated. She again referenced the restroom incident as an example of Respondent responding to frustration with inappropriate behavior rather than constructive problem-solving.
The doctor reviewed Respondent's childhood behavioral history, including a suspension in the eleventh grade and truancy in the ninth grade. However, she testified that she lacked sufficient information to determine whether these behaviors were atypical or indicative of a relevant dynamic risk factor. Therefore, she indicated that childhood behavioral problems may apply.
Dr. Eisenstein-Rosan next considered grievance and hostility, which she testified may apply. This factor reflects the Respondent's tendency to attribute responsibility for his problems to others, rather than accepting personal accountability. Respondent reported that certain sanctions imposed during sex offender treatment were unfair and expressed that he felt bullied by staff. He also reported ongoing difficulties with authority figures.
Negative social influences were also identified as a potential risk factor. Dr. Eisenstein-Rosan cited Respondent's arrest for luring a young girl from her apartment so she could be assaulted by others, the commission of sexual offenses with co-offenders, and his statements regarding associations with pimps. She also referenced two incidents during incarceration involving video calls—one with Respondent's mother and another with his fiancée. His fiancée displayed sexually suggestive behavior in a manner observable by staff. The doctor observed that while these relationships can provide emotional support, they undermine Respondent's ability to comply with rules and regulations and do not support him in staying on a lawful path.
Dr. Eisenstein-Rosan testified that completing sex offender treatment is a factor that reduces sexual recidivism. However, Respondent has never completed sex offender treatment, having rejected opportunities to do so while incarcerated. A May 2025 progress report indicated that Respondent made minimal to no progress on treatment goals and objectives, although it noted a recent increase in motivation that had previously been absent.[FN3]
Respondent also missed multiple substance abuse treatment sessions after he had admitted to using K2 and tested positive for marijuana.
Moreover, based on Dr. Eisenstein-Rosan's review of the records, Respondent has not given meaningful or detailed thought to what he would need to do to avoid reoffending in the community. Although Respondent indicated that he does not require additional treatment, his conduct at STARC since April 2024—including five losses of privileges, the most recent on December 20, 2024, multiple red alerts, and repeated threats of a hunger strike—demonstrates [*3]that he has not yet developed the emotional stability or consequential thinking necessary to make sound decisions.
Based on her professional opinion, Dr. Eisenstein-Rosan concluded that Respondent has serious difficulty controlling his behavior and is a dangerous sex offender requiring confinement and, therefore, release to a regimen of a Strict and Intensive Supervision and Treatment ("SIST") would not be appropriate in this case. She characterized SIST as "parole on steroids." She described SIST as involving strict supervision through numerous stipulations, including increased parole check-ins, GPS monitoring, mandatory treatment, alcohol-monitoring bracelets, drug testing, and compliance with any of more than 100 possible conditions.
Dr. Eisenstein-Rosan based her conclusion on multiple factors, including the nature of Respondent's offenses—his age at the time, the condensed timeframe in which they were committed, and the use of weapons—as well as his expulsion from and refusal to participate in sex offender treatment and the most recent progress report reflecting minimal to no treatment progress. She also relied on Respondent's drug use while in secure facilities and his unexcused absences from substance abuse treatment. Additionally, she noted his refusal to take prescribed medication for kidney stones and vitamin D deficiency, together with his well-above-average Static-99R risk score. Based on these considerations, Dr. Eisenstein-Rosan opined that Respondent lacks the ability to comply with SIST conditions and the self-control necessary to refrain from sexual offending if released into the community.
Dr. John Thomassen
Dr. John Thomassen was accepted by the Court as an expert in forensic psychology. He reviewed Respondent's institutional and treatment records from April 2024 through July 2025 to assess whether Respondent is a dangerous sex offender requiring confinement. The materials reviewed included Respondent's individual service plan, loss of privileges reports, treatment schedules, psychiatric evaluations, and addendum reports authored by Dr. Pola Eisenstein-Rosan and Dr. Leonard Bard. In forming his opinion, Dr. Thomassen relied on the Static-99R and Static-2002R actuarial instruments, the Stable-2007 dynamic risk instrument, and a clinical profile assessment of Respondent's personality pattern and pattern of offending.
Dr. Thomassen diagnosed Respondent with narcissistic personality disorder, other specified personality disorder with antisocial traits, and moderate cannabis use disorder. He explained that these diagnoses are relevant because they are underlying components of Respondent's behavior which predispose him to sexual offending. Dr. Thomassen testified that Respondent demonstrates a persistent pattern of elevating himself above others, as evidenced by his history of four sexual offenses, three of which resulted in rape convictions involving the use or threatened use of weapons and where he demeaned, terrorized, and abused women. According to Dr. Thomassen, these offenses reflect Respondent's need for control and elevating his sense of self, which reinforces narcissistic traits.
Dr. Thomassen further testified that since the age of seventeen, Respondent has engaged in manipulative conduct and exhibited limited empathy toward others. He cited Respondent's involvement in a non-sexual offense in which a woman was lured from her apartment so she could be assaulted by others, which he testified was consistent with Respondent's broader pattern of exploiting and victimizing women.
The Respondent also reported feeling superior to other residents at STARC and described an inability to relate to other participants in sex offender treatment because he believed himself [*4]to be more gifted or intelligent. He further expressed that he perceived staff as demeaning and believed he needed to "battle" with them, which Dr. Thomassen testified reflected entitlement and hostility similar to Respondent's attitudes toward his sexual offense victims.
Although Dr. Thomassen did not diagnose antisocial personality disorder due to insufficient data regarding Respondent's behavior prior to age fifteen, he testified that Respondent's conduct during incarceration was consistent with antisocial personality traits. Respondent repeatedly violated institutional rules by using prohibited substances, including cannabis, synthetic cannabinoids, and PCP, and by engaging in other misconduct. The Respondent has described himself as having a hard time when his wishes are not immediately granted or when he is challenged in any way, which has led to altercations with a staff member and a peer. Based on Respondent's long-standing inability to comply with laws and rules since adolescence, Dr. Thomassen opined that Respondent is unlikely to comply with conditions of release or the law if released.
With respect to Respondent's cannabis use disorder, Dr. Thomassen testified that Respondent accumulated approximately fifteen disciplinary infractions related to cannabis or synthetic cannabis use and attempted to sell drugs multiple times while incarcerated. Respondent has had multiple incidents of either being seen under the influence or testing positive for substances while at STARC, resulting in the loss of privileges. Dr. Thomassen opined that Respondent's substance use is part of a destabilizing lifestyle pattern that increases his risk of sexual reoffending by impairing judgment and lowering inhibitions.
Dr. Thomassen also considered Respondent's sexual history, including his access to consensual sexual partners and his use of prostitutes while in relationships. Respondent reported having approximately forty to fifty sexual partners and stated that he used prostitutes because it was easier than forming relationships when he desired sex. Dr. Thomassen testified that Respondent's rapid reoffending, including committing offenses shortly after release from custody and encouraging peers to join in the offense, reflected enjoyment of the offending behavior and reinforcement of his sense of control over victims. Dr. Thomassen opined that despite having the ability to engage in consensual sexual activity, Respondent repeatedly chose sexually abusive conduct that terrorized and degraded his victims, consistent with narcissistic and antisocial traits.
The doctor concluded that given the wide age range of the victims, the settings in which the crimes occurred, and the lack of transparency the Respondent had with his internal thoughts, urges, impulses, supervision under SIST would not be effective.
Dr. Thomassen further testified that Respondent lacks motivation to change his behavior because he minimizes his responsibility by characterizing his victims as prostitutes and viewing the conduct as consensual and normal. According to Dr. Thomassen, this minimization reinforces Respondent's sense of entitlement and permits continuation of abusive behavior. He also testified that Respondent's pattern of offending beginning at age seventeen and continuing into young adulthood increases the likelihood of sexual reoffending later in life.
In assessing Respondent's actuarial risk, Dr. Thomassen scored Respondent a seven on the Static-99R, placing him in the well-above-average risk category for sexual recidivism.[FN4]

He also scored Respondent an eight on the Static-2002R, which incorporates general criminal recidivism, likewise placing him in the well-above-average range. Dr. Thomassen testified that individuals with a Static-2002R score of eight have an estimated five-year recidivism rate of approximately 24.6% to 39% and a twenty-year rate of approximately 52%. He opined that although parole supervision and SIST could reduce Respondent's risk to some extent, the overall risk would remain high.
Dr. Thomassen also administered the Stable-2007, on which Respondent scored a total of thirteen points, [FN5]
indicating a high risk of sexual reoffending. Respondent scored highest in factors related to cooperation with supervision, lack of concern for others, and hostility toward women. Respondent scored in the moderate range on several additional factors, including capacity for relationship/stability general social rejection, impulsivity, a deviant sexual preference, sex drive, sexual preoccupation or problem-solving skills, and negative emotionality.
The categories which the Respondent scored a zero were negative social influences, emotional identification with children, and sex as coping.
Dr. Thomassen acknowledged that Respondent has not engaged in sexual misconduct since 2013 while in DOCCS or STARC custody, that Respondent's only impulsive act within the preceding six months occurred in June 2025, and that recent treatment notes reflect increased engagement and reduced overt oppositional behavior. Nevertheless, Dr. Thomassen testified that he did not believe Respondent had made substantive progress in treatment. He further acknowledged that parole supervision and positive family or social supports may mitigate risk for some offenders by providing structure and stability.
Dr. Thomassen expressed significant concern regarding Respondent's inability to work productively with treatment providers during prior placements at DOCCS and STARC. He opined that Respondent's repeated discharges from treatment and minimal progress indicate that he would be unable to work effectively with treatment providers if placed on SIST. Dr. Thomassen also testified that Respondent does not acknowledge a substance abuse problem, increasing the likelihood that he would resume substance use if released and become vulnerable to acting on sexual urges. Moreover, Respondent relies on inadequate coping strategies, including minimization, elevating himself above others, substance use, exploitative behavior.
Based upon Respondent's actuarial scores, dynamic risk factors, sexual offense history, and behavioral patterns in the community, during incarceration, and in treatment, Dr. Thomassen concluded to a reasonable degree of psychological certainty that Respondent is a dangerous sex offender requiring confinement.
Respondent's Case
Dr. Leonard Bard
Dr. Leonard Bard was accepted by the Court as an expert in forensic psychology. Dr. Bard interviewed the Respondent in June 2024 and also testified at his Mental Hygiene Law Article 10 trial. He diagnosed Respondent with other specified personality disorder with antisocial features and cannabis use disorder and opined that Respondent does not meet the [*5]statutory definition of a mental abnormality.[FN6]

In conducting his assessment, Dr. Bard utilized the Static-99R and considered relevant dynamic risk factors, including general self-control, sexual self-control, attitudes of sexual offending, intimacy deficits, participation and progress in treatment, and release conditions.
Like Dr. Eisenstein-Rosan and Dr. Thomassen, Dr. Bard scored Respondent a seven on the Static-99R. He based this score on Respondent's prior sexual convictions, his relationship with the victims, his marital status, and his age. Dr. Bard testified that a score of seven is considered high and corresponds to a group recidivism rate of approximately 24 percent over five years. He explained that while the Static-99R measures group-based risk rather than an individual's specific likelihood of reoffending, the instrument has been strengthened by the expansion of its offender sample, making it increasingly reliable. He also noted that the sample does not include individuals supervised under SIST, which he viewed as significant because SIST provides structured supervision and intervention in the community.
After considering dynamic risk factors, Dr. Bard concluded that Respondent's risk of sexual reoffending is substantially lower than suggested by actuarial scores alone. He based this conclusion on Respondent's lack of sexual misconduct since his convictions, his efforts to participate in treatment, his ability to articulate perceived changes in his behavior, the presence of community and family support, the availability of SIST supervision, and a reduction in Respondent's overall antisocial behavior.
With respect to general self-control, Dr. Bard acknowledged that Respondent engaged in institutional misconduct, including fights, loss of privileges, and disruptive behavior. He attributed much of this conduct to Respondent's antisocial personality features, including arguments with staff, threats of hunger strikes, and threats to defecate in a bucket when the restroom was closed. However, Dr. Bard testified that Respondent's behavior had improved over the six to eight months preceding this hearing, although he acknowledged that self-control remained an area of concern.
Dr. Bard testified that sexual self-control was a positive factor for Respondent, noting that Respondent has not engaged in sexual misconduct while incarcerated or while at STARC. He opined that there were no indications that Respondent is unable to manage his sexual behavior. While acknowledging that opportunities to offend are more limited in custody, Dr. Bard testified that sexual acting out in institutional settings is not impossible and that many individuals do engage in such behavior.
Dr. Bard also considered cognitive distortions, defined as attitudes tolerant of sexual offending. He testified that Respondent has been inconsistent in his accounts of past offenses and has minimized his role, identifying this as an important treatment issue.
With respect to intimacy deficits, Dr. Bard testified that this factor does not currently appear to be significant for Respondent.
Dr. Bard described Respondent's treatment history as a "mixed bag." He testified that Respondent voluntarily participated in prison-based sex offender treatment at Marcy Correctional Facility but was suspended on multiple occasions. Respondent later participated in treatment at Altona Correctional Facility, where his performance appeared improved. At [*6]STARC, Respondent has participated in treatment but made minimal progress. As of April or May 2025, Respondent attended his core treatment group but did not participate in substance abuse treatment.
The last factor that Dr. Bard consider was whether the Respondent was going to be supervised or not.
Dr. Bard identified supervision as a critical factor in assessing Respondent's risk. He testified that SIST has a proven track record of reducing recidivism through intensive supervision, GPS monitoring, and mandated participation in sex offender and substance abuse treatment, which he emphasized is particularly important in Respondent's case.
Dr. Bard acknowledged that Respondent accumulated approximately thirty disciplinary tickets while incarcerated, a number slightly above average, and that at least half were drug-related. These included incidents of using drugs at STARC and arranging for drugs to be brought into the facility and distributed to others, with the most recent incident occurring in 2024. Dr. Bard testified that Respondent refused to participate in substance abuse treatment as recently as May 2025 and stated that Respondent must acknowledge his substance use disorder for treatment to be effective.
Dr. Bard further testified that parole supervision and family support would serve to lower Respondent's risk of reoffending by providing structure and stability.
Regarding Respondent's age at the time of the offenses, Dr. Bard testified that Respondent would be considered an adolescent offender and that adolescents generally exhibit reduced impulse control over sexual urges. He further opined that Respondent's current age and the absence of sexual misconduct since his convictions undermine the argument that the temporal proximity of his offenses demonstrates an ongoing inability to control sexually offending behavior.
Dr. Bard acknowledged that Respondent has provided multiple and inconsistent accounts of his sexual offenses and has minimized his responsibility. He also acknowledged that antisocial personality features, impulsivity, and substance abuse increase Respondent's risk of sexual reoffending in the community. Dr. Bard further acknowledged that while Respondent has not engaged in sexual misconduct while incarcerated, he does not have the same access to potential victims or opportunities to offend as he would in the community.
B.M.
B.M., the Respondent's mother, is employed at Northwell hospital and has lived with the Respondent since his birth. She described the Respondent as caring, loving, funny, and kindhearted, and testified that these traits have been consistent since his teenage years. She stated that the Respondent was always helpful around the house and maintained positive relationships with women, whom Respondent treated with care and respect. B.M. testified that she was aware of the nature of Respondent's offenses and stated the offenses were inconsistent with the person she knew. She stated that during the period when the Respondent was engaging in criminal behavior, she did not observe any notable changes in his demeanor or personality.
B.M. further testified that the Respondent began using marijuana during his senior year of high school. During his incarceration, she spoke with the Respondent three to four times daily and visited him in prison on multiple occasions. Although the Respondent did not discuss the specifics of his offenses with her, B.M. testified that he has matured significantly and is no longer the same individual he was at ages seventeen or twenty. She stated that the Respondent has strong family support should he be released, and that she has researched community [*7]organizations to assist with his reentry. She testified that she has discussed with the Respondent the consequences of his actions and their impact on both him and the family, and that she is willing to assist him with reintegration by maintaining daily contact and relying on extended family support.
M.M.
M.M., the Respondent's stepfather, also testified on behalf of the Respondent. M.M. is a retired New York City sanitation worker and has known the Respondent since the Respondent was approximately nine years old. He described the Respondent as energetic, respectful, loving, and dependable, and testified that the Respondent was a unifying presence among the siblings in their blended family. M.M. stated that as a teenager, the Respondent had many friends, enjoyed playing basketball, and experienced a normal childhood. He testified that although the Respondent became more independent in his twenties, he remained reliable within the household. Based on his recent conversations with the Respondent, M.M. stated that the Respondent is now more mature.
M.M. testified that he was aware of only one romantic relationship involving the Respondent. He also testified that when the Respondent began committing criminal acts, he noticed the Respondent became more withdrawn and distant. He stated that he was unaware of the Respondent's marijuana use until the Respondent's initial incarceration. During the Respondent's incarceration, M.M. maintained regular communication with him and visited him in prison. He testified that the Respondent has acknowledged the poor choices he made and their effect on the family. M.M. further testified that, if the Respondent were released, he would provide close supervision and support, noting that his retirement would allow him to be home and more actively involved in monitoring the Respondent's behavior.
T.M.
T.M., the Respondent's brother, is employed as a probation officer in the Bronx, where his responsibilities include supervising individuals to ensure compliance with court-ordered conditions and participation in required programs. Prior to his current position, he worked in public safety for the City University of New York. T.M. testified that he has positive memories of his relationship with the Respondent and that he communicated with the Respondent periodically during his incarceration. He stated that, in his opinion, the Respondent has matured significantly while incarcerated. T.M. testified that, if the Respondent were released, he would assist him in accessing programs and opportunities to support his reintegration and career development.
DISCUSSION
Following a jury determination that Respondent is a detained sex offender who suffers from a mental abnormality under Mental Hygiene Law § 10.03(i), the Court held a hearing to determine whether Respondent is either a dangerous sex offender requiring confinement or a sex offender requiring SIST (see Mental Hygiene Law §10.03[f]).
Pursuant to the Mental Hygiene Law §10.11(d)(4), "the court shall make its determination of whether the respondent is a dangerous sex offender requiring confinement in accordance with the standards set forth in subdivision (f) of section 10.07 of this article. . . . If the court determines that the attorney general has met the burden of showing by clear and convincing evidence that respondent is a dangerous sex offender requiring confinement, the court shall order that the respondent be committed to a secure treatment facility immediately."
The Mental Hygiene Law defines "mental abnormality" as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law §10.03[i]). 
The statute also defines a "dangerous sex offender requiring confinement" as a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that such person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law §10.03[e]).
The law distinguishes between offenders who have difficulty controlling sexual behavior, who must be treated as outpatients, and those unable to control it, who must be confined (Matter of State of New York v Michael M., 24 NY3d 649, 659 [2014]).
After reviewing the trial record and considering the testimony of Dr. Eisenstein-Rosan, Dr. Thomassen, and Dr. Bard, and Respondent's family, the Court finds that the State has met its burden by clear and convincing evidence that Respondent is a dangerous sex offender requiring civil confinement.
The Court notes that all the experts scored Respondent in the well-above-average risk category on the Static-99R instrument. While Dr. Bard noted certain limitations to the instrument, he acknowledged its increasing reliability based on the expansion of its offender sample. Dr. Eisenstein-Rosan testified that the Static-99R is routinely used and accepted by professionals in the field of psychology to determine the risk of sexual recidivism of an individual being released into the community. Additionally, Dr. Thomassen testified that the Static-99R is the best predictor of an individual's risk for re-offending and should be used with other sources of information. However, the Static-99R only serves as a baseline to determine an individual's risk for sexually reoffending. In addition to the Static-99R, Dr. Eisenstein-Rosan considered meaningful dynamic risk factors and Dr. Thomassen considered the Static-2002R actuarial instrument, the Stable-2007 dynamic risk assessment, and a clinical profile assessment. Dr. Bard also considered dynamic risk factors.
Both Dr. Eisenstein-Rosan and Dr. Thomassen opined to a reasonable degree of psychological certainty that Respondent is a dangerous sex offender requiring confinement.
Dr. Eisenstein-Rosan highlighted multiple dynamic risk factors, including Respondent's early onset of a pattern sexual offending, minimization of responsibility and victim-blaming, substance abuse while incarcerated, impulsive and reckless behavior, negative peer associations, and difficulty with authority, poor decision-making, and failure to complete sex offender or substance abuse treatment.
Dr. Thomassen testified that Respondent's narcissistic personality disorder, other specified personality disorder with antisocial traits, and moderate cannabis use disorder continue to predispose him to sexual offending. Moreover, Respondent relies on maladaptive coping strategies, including minimization, elevating himself above others, substance use, exploitative behavior.
In contrast, Dr. Bard concluded that the Respondent's risk is substantially lower than the Static-99R results because Respondent has not committed sexual misconduct during his confinement, his efforts to participate in treatment, his ability to articulate perceived changes in his behavior, the presence of community and family support, the availability of SIST [*8]supervision, and a reduction in Respondent's overall antisocial behavior.
Notwithstanding, Dr. Bard acknowledged that Respondent has continued to struggle with general self-control, evidenced by incidents such as threatening to defecate in a bucket in June 2025. Although there was no evidence of sexual misconduct while incarcerated, Dr. Eisenstein-Rosan emphasized Respondent's continued poor decision-making and inadequate responses to frustration demonstrate that Respondent does not possess the broader self-regulation necessary to resist the increased opportunities for sexual reoffending in the community (People v Nathanael W., 234 AD3d 701 [2d Dept 2025]).
Moreover, all three experts agreed that Respondent continues to minimize his accountability for past sexual offenses (see, e.g., State v Raul L., 186 AD3d 607, 610 [2d Dept. 2020] [respondent believed he did not commit a sex offense and repeatedly denied responsibility for his actions]). Dr. Bard identified this as an important treatment issue for the Respondent. A failure to successfully engage in or complete sex offender treatment is a factor courts often consider when determining whether a respondent can control his behavior (Rene I. v State, 146 AD3d 1056, 1057-58 [3d Dept. 2017]). 
In Rene I. v State, the Appellate Division, Third Department, affirmed a finding that the respondent was a dangerous sex offender requiring civil confinement where he declined to participate in an evaluation, failed to complete treatment due to his own conduct, and demonstrated poor insight and an inability to identify his triggers. Similarly, here, the Respondent has not completed sex offender treatment. Rather, he has been suspended from treatment, refused to attend sessions, and has demonstrated minimal to no progress in his core treatment group. This persistent resistance to treatment and mitigation reflect the Respondent's continued inability to accept full responsibility for his past sexual offenses.
Additionally, all three experts diagnosed the Respondent with cannabis use disorder and agree that Respondent must acknowledge his substance use disorder for treatment to be effective. Respondent has had multiple incidents of either being seen under the influence or testing positive for substances while in DOCCS and STARC, he has arranged for drugs to be smuggled into the secured facilities, he has attempted to sell drugs, and he has received approximately fifteen infractions related to cannabis or synthetic cannabis use — more than half of his total disciplinary infractions received. Despite this, he has refused to acknowledge that he has a problem with substance use and has refused to attend treatment. So, while the Respondent's behavior has improved in the six to eight months prior to this hearing, he demonstrates an unwillingness to acknowledge his treatment needs or to work with treatment providers.
Respondent argues that SIST placement would allow him to receive additional treatment; however, the evidence shows he has not meaningfully participated in current treatment programming. While SIST provides structured supervision and intervention in the community and can help reduce an offender's risk of sexual reoffending, it is unlikely to be effective for Respondent, who has demonstrated an inability to follow rules and engage meaningfully in treatment. Consequently, there is little confidence that he would comply with additional treatment hours or adhere to the potentially 80 to 100 conditions of SIST supervision if released.
The experts also agreed that community and family support can help reduce Respondent's risk of reoffending. The Court credits the testimony of B.M., M.M., and T.M., who all spoke positively about Respondent, have maintained regular communication with him during his incarceration, and pledged to assist and support his reintegration into the community. While the Court recognizes that family support is an important and persuasive factor in considering release, [*9]it is not satisfied that Respondent would be forthcoming or transparent enough to make such support effective.
Significantly, Respondent is no longer the seventeen-year-old adolescent under parental supervision who committed his first offense; he is now a thirty-four-year-old adult, which could make it difficult for his family to intervene if he resists their assistance. Although his family is aware of his past offenses, they do not know the full details. Moreover, Respondent has continued to provide inconsistent accounts of the offenses, mitigate his own responsibility, and shift the blame to the victims. 
B.M. testified that she was disturbed upon learning of the offenses because they were inconsistent with the person she knows, and that during the period of Respondent's criminal behavior, she observed no notable changes in his demeanor or personality. The Court finds this demonstrates that Respondent is capable of concealing aspects of his behavior and challenges from his family, limiting any potential intervention should challenges arise under SIST supervision.
Thus, the Court finds that Petitioner has introduced credible evidence that Respondent continues to have poor impulse control, cognitive distortions, antisocial attitudes and behaviors, and has not yet allowed himself to undergo the treatment that would allow himself see his challenges to avoid risky behavior that would increase his risk of re-offending (see State v Anthony A., 219 AD3d 1524, 1526 [2d Dept. 2023]; State v Patrick F., 217 AD2d 870 [2d Dept 2023]; Sincere M. v State, 156 AD3d 1427 [4th Dept. 2017]).
In sum, Petitioner has met its burden, by clear and convincing evidence, that the mental abnormalities from which Respondent suffers involve such a strong predisposition to commit sex offenses and such an inability to control his behavior that he is likely to be a danger to others and to commit sex offenses if he is not confined to a secure treatment facility. 
Accordingly, Respondent is ordered committed to a secure treatment facility for care, treatment, and control until such time as he no longer requires confinement (Mental Hygiene Law § 10.07[f]).
This opinion constitutes the Decision and Order of the court.
ORDERED
HON. JOANNE B. WATTERS, AJSC
Dated: January 9, 2026
Queens, New York

Footnotes

Footnote 1:The lowest possible score on the Static-99 is a negative three and the highest possible score is a twelve. A score of two is the average for a sex offender; a score of five is above average; and a score of six is well-above average.

Footnote 2:Meaningful dynamic risk factors are routinely used and accepted by professionals in the field of psychology to determine the risk of sexual recidivism of an individual released into the community.

Footnote 3:Respondent's current age — thirty-four years old — and time in the community since the offense are factors that do not apply. Because Dr. Eisenstein-Rosan did not personally interview Respondent, she was unable to assess whether he would have an adequate support system upon release. She also testified that several dynamic risk factors did not apply to Respondent, including deviant sexual interest, sexual preference for children, sexualized violence, multiple paraphilias, emotional incongruence with children, employment instability, and sexual deviance associated with high psychopathy.

Footnote 4:While the STATIC-99R is only moderately predictive of whether an individual will re-offend and should be used with other sources of information, it is the best predictor of an individual's risk for re-offending. 

Footnote 5:The original score of fourteen was amended given the Respondent's current romantic relationship.

Footnote 6:Dr. Bard was the only expert who interviewed the Respondent, as the Respondent declined to participate in interviews with the other evaluating doctors.