================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 224
In the Matter of State of New
York,
            Respondent,
        v.
Michael M.,
            Appellant.



            Margot S. Bennett, for appellant.
            Frank Brady, for respondent.



PIGOTT, J.:

        In this Mental Hygiene Law article 10 proceeding, we

hold that the evidence was legally insufficient to justify

revoking respondent's strict and intensive supervision and

imposing secure confinement.  We base our holding on the

distinction between a "sex offender requiring strict and

- 1 -

intensive supervision" and a "dangerous sex offender requiring confinement," as defined in the relevant statutes.

I.

Respondent Michael M. pleaded guilty to sex offenses including sexual abuse in the first degree (Penal Law § 130.65 [3] [subjects a person under 11 years to sexual contact]) and was incarcerated for over a decade.  When his term of imprisonment neared its end in 2008, the State commenced a civil commitment proceeding against him pursuant to Mental Hygiene Law article 10. Supreme Court found probable cause to believe that respondent was a dangerous sex offender requiring confinement, within the meaning of Mental Hygiene Law § 10.03 (e), and ordered him committed to a secure treatment facility pending the conclusion of the proceeding (see Mental Hygiene Law § 10.06).

Respondent moved to dismiss the article 10 petition and, at the same time, commenced a proceeding seeking a writ of habeas corpus directing his release, contending that – for procedural reasons not pertinent to this appeal – he was not a lawfully detained sex offender under Mental Hygiene Law § 10.03 (g) (1).  In March 2010, Supreme Court dismissed the article 10 petition, granted respondent habeas corpus relief, and released him into the community.  Eight months later, the Appellate Division reversed Supreme Court's order, but respondent remained in the community, without supervision, pending completion of his article 10 trial.  There is no evidence of criminal activity by

respondent during this period, which eventually lasted nearly two years.

In September 2011, Supreme Court held a bench trial on two issues: whether respondent suffered from a mental abnormality as defined by Mental Hygiene Law § 10.03 (i) (see Mental Hygiene Law § 10.07 [d]) and whether he suffered from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility (see Mental Hygiene Law §§ 10.03 [e], 10.07 [f]).  Experts called by the State and by respondent agreed that he suffered from a mental abnormality within the meaning of article 10, but the State's expert opined that respondent's condition necessitated confinement whereas respondent's expert insisted that he could be safely managed under "strict and intensive supervision" (SIST) (see Mental Hygiene Law § 10.03 [r]).

On November 15, 2011, Supreme Court imposed SIST, rather than confinement, and placed respondent under the custody and control of the New York State Department of Corrections and Community Supervision.  A parole officer, assigned to supervise respondent, met with him on November 21 to review his SIST conditions.[1]

---

[1] Michael M. attended all of his appointments with his parole officer in a timely manner.

Respondent was required to attend a sex offender treatment program at Mid-Erie Counseling and Treatment Services (Mid-Erie) in Buffalo.  On November 22, 2011, a mental health counselor at Mid-Erie met with respondent for an "intake appointment."  She scheduled two meetings for him on December 6: a 12:30 p.m. appointment for a chemical dependency orientation program, at Mid-Erie's main office on the East Side of Buffalo, and a 2 p.m. appointment with herself for an initial sex offender assessment, at the office of the New York State Division of Parole in downtown Buffalo.  Respondent attended the 12:30 p.m. program, leaving Mid-Erie at about 1:45 p.m. and telling staff that he was on his way to a 2 p.m. appointment with the counselor.  As respondent did not have a car of his own, his mode of transportation was a public bus.

Respondent did not appear at the parole office for his meeting with the mental health counselor at the scheduled time. Reached on his cell phone, respondent, in the judgment of Mid-Erie, failed to provide a reasonable excuse for his tardiness. Soon after 3 p.m., respondent arrived at the office, where he blamed the counselor for scheduling two appointments so close in time and expressed displeasure at being on SIST.  A "team meeting" at Mid-Erie was scheduled for the following week.

Meanwhile, respondent was having financial difficulty. He had lost his job as a taxi driver when his employer learned that he was a registered sex offender, and was evicted from his

apartment a week later for failure to pay rent.  Respondent's
parole officer arranged for a residential placement at Grace
House, which provides transitional housing for men who might
otherwise be homeless.  As a condition of placement at Grace
House, residents are required to attend a Department of Social
Services "job preparation program."  Respondent enrolled in the
program but, according to his parole officer, "he was late on two
occasions and on another occasion he did not bring in the
required three applications."[2]  On December 9, 2011, about a week
after commencing the job preparation program, respondent was
terminated from the program.  As a result, on December 12, 2011,
respondent was discharged from Grace House.  His parole officer
directed him to find shelter at the Buffalo City Mission.

At the "team meeting" at Mid-Erie on December 13, 2011,
counselors raised concerns about several aspects of respondent's
circumstances, including the missed appointment with his
counselor on December 6, his loss of employment and independent
residence, and his termination from the job program and eviction
from Grace House.  Team members also expressed concerns about
respondent's relationship with a girlfriend who suffered from
certain "mental health problems," but did not allege that the

---

[2] Michael M.'s own recollection was that he was late by ten
minutes "due to the bus schedule" on one occasion, he submitted
incomplete paperwork on another occasion because he was "worried
about transportation back to downtown and the curfew at Grace
House," and he produced inaccurate information on job
applications on the third occasion.

relationship violated any of respondent's SIST conditions.
Kenneth Duszynski, Forensic Program Director at Mid-Erie, was
present at the meeting.  As he later recalled, respondent refused
to answer questions and became angry.  His parole officer found
respondent defensive and sarcastic.  At the conclusion of the
meeting,[3] Duszynski discharged respondent from the sex offender
treatment program at Mid-Erie for failure to cooperate.  Treating
the discharge as a violation of SIST conditions, respondent was
arrested (see Mental Hygiene Law § 10.11 [d] [1]).

                                II.

        These events triggered a reevaluation of respondent
under Mental Hygiene Law § 10.11 (d) (1).  Dr. Paul Etu, a board-
certified psychologist, interviewed respondent at the Erie County
Holding Center on December 15.  Respondent, when questioned by
Dr. Etu about his sexual urges, indicated that he was "learning
to control the urges" by means of certain "tools" he had learned,
in particular diverting his attention from young girls he
encountered or, failing that, moving rapidly away from them.
Respondent described this "relapse prevention plan" as a fight-
or-flight response.  He also mentioned supportive family members

_____

        [3] The record contains a letter from Duszynski to Michael
M.'s parole officer, dated December 12, 2011, i.e. the day before
the "team meeting," discharging Michael M. from treatment at Mid-
Erie and requesting that the parole officer take Michael M. into
custody.  No explanation has been provided for this "pre-meeting"
determination.  We assume for the purposes of this factual
recitation that the date on this letter is a typographical error,
and that it was written in light of events on December 13.

and church ministers, as well as a sexual relationship with his girlfriend.  On the other hand, Dr. Etu found respondent exhibited a combative attitude when SIST conditions were discussed.  He told Dr. Etu that he felt that had served his time for his sex offenses and was being unfairly treated.  In particular, respondent objected to his counselor's criticism of his relationship with the girlfriend who suffered from "mental health" issues: "She can't tell me that," respondent told Dr. Etu, "She can't tell me who to love."

Dr. Etu issued a report, opining that respondent was a dangerous sex offender requiring confinement.  Dr. Etu noted that respondent had "displayed . . . deviant sexual interest in young, female children" and "acknowledged that he still [had] urges in this regard."  He further opined that respondent appeared "to have an ingrained sense of entitlement and a disdain for the therapeutic community," which respondent perceived as antagonistic, rather than supportive.

On December 19, 2011, barely a month after Supreme Court had reached its SIST decision, the State petitioned for an order pursuant to Mental Hygiene Law § 10.11 (d), revoking respondent's release to SIST and confining him to a secure treatment facility.  In addition to the report from Dr. Etu, the State submitted an affidavit and incident report from respondent's parole officer and a letter from Duszynski opining that respondent required confinement.  Supreme Court found

probable cause to believe that respondent was a dangerous sex offender requiring confinement and ordered him committed to a secure treatment facility pending a hearing, pursuant to Mental Hygiene Law § 10.11 (d) (4). Respondent moved to dismiss the petition or, in the alternative, to modify the SIST conditions to permit treatment through another provider.

At a two-day hearing in March 2012, Supreme Court heard testimony from Dr. Etu, Mr. Duszynski, respondent's parole officer, and his counselor. Dr. Etu opined, consistently with his report, that respondent was a dangerous sex offender requiring confinement. He testified that respondent had elaborated at his interview "how at times [sexual] urges would come on and how he would try to fight them off and basically [had] fought them off" but "was still having difficulty with that." Dr. Etu further testified that respondent had told him that, although he now understood that it had been wrong to believe that his victims enjoyed sexual activity with him or "came on to him", the idea still came "into his head once in a while."

Dr. Etu further supported his conclusion by presenting evidence of "static and dynamic risk factors." According to Dr. Etu, these factors, in particular the Static-99-R test, indicated that respondent had a 23% chance of "reoffending" within the next 10 years and a 46% chance of "reoffending" in his lifetime. Dr. Etu also testified that respondent "was resistant to counseling,"

did not trust the counselors at Mid-Erie, and could not "work
with them."

Duszynski testified that respondent had been sarcastic
and defensive at the December 13 "team meeting." Asked why
respondent had been discharged from Mid-Erie, Duszynski's
assessment was that respondent was not willing to follow "the
rules of either treatment or supervision," placing him "in a very
high risk situation."

On April 19, 2012, Supreme Court determined that the
State had proved by clear and convincing evidence that respondent
was a dangerous sex offender requiring confinement (see Mental
Hygiene Law §§ 10.11 [d] [4], 10.07 [f]). Accordingly, the court
revoked respondent's release on SIST and committed him to a
secure treatment facility. Nevertheless, Supreme Court's written
decision was highly critical of Mid-Erie and of respondent's
parole officer.

> "It is clear that the Parole Officer and
> therapists were put off by [Michael M.]. The
> animus projected toward [Michael M.]
> throughout this proceeding literally was
> pooling on the courtroom floor. What is the
> genesis of this animus? Repulsion over
> [Michael M.'s] criminal acts? Repulsion over
> [Michael M.]'s appearance? Displeasure over
> his past criticism of Parole or Mid-Erie? A
> general reluctance to perform the work
> necessary to service, and perhaps benefit
> [Michael M.] and the community? We will
> never know. . . . There is a word for that:
> Callousness."

Respondent perfected his appeal and additionally
petitioned for discharge upon annual review (see Mental Hygiene

Law § 10.09).  Supreme Court in the county of respondent's confinement issued an order of continued confinement, upon the yearly review, before respondent's appeal was calendared, and the State moved to dismiss the appeal as moot.  The Appellate Division affirmed on the merits (109 AD3d 1181 [4th Dept 2013]).  This Court granted respondent leave to appeal.  Under the circumstances of this case, the appeal is not moot, because the continued confinement order was affected by the order challenged here, changing respondent's level of disposition from SIST to secure confinement.  However, we disagree with the Appellate Division on the merits, and now reverse.

III.

Respondent raises three arguments: that Supreme Court failed to apply "the least restrictive alternative doctrine" to his civil management; that the evidence at trial was legally insufficient to demonstrate clearly and convincingly that he was unable to control his sexual conduct to the extent that he was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility; and that the manner in which his SIST was implemented and revoked violated his right to due process of law.

In arguing that a doctrine of the least restrictive alternative should apply in proceedings under Mental Hygiene Law article 10, respondent relies on certain statutes that incorporate the doctrine, including provisions of the Mental

Hygiene Law governing assisted outpatient treatment of the mentally ill (see Mental Hygiene Law § 9.60 [h] [4] [ii]; [i] [3]; [j] [2]).  The right to a least restrictive alternative, he argues, should likewise apply to convicted sex offenders.  The Appellate Division correctly rejected respondent's contention (109 AD3d at 1182, citing Matter of State of New York v Gooding, 104 AD3d 1282 [4th Dept 2013], lv denied 21 NY3d 862 [2013] and Matter of State of New York v Enrique T., 93 AD3d 158, 173 [1st Dept 2012], lv dismissed 18 NY3d 976, 977 [2012]).  Least restrictive alternative principles are not automatically transferable from one article of the Mental Hygiene Law to another.  "[S]ex offenders in need of civil commitment are a different population from traditional mental health patients, who have different treatment needs and particular vulnerabilities" (MHL § 10.01 [g]).  Moreover, Mental Hygiene Law article 10, as written, is already designed to provide courts with a mechanism for deciding whether the mental condition of a sex offender suffering from a mental abnormality is so extreme that the more restrictive alternative of confinement is warranted or whether, on the other hand, the least restrictive option, namely SIST, is permitted.  The statute, then, implicitly contains its own "least restrictive alternative doctrine."

                              IV.

        Respondent's second argument is based on legal insufficiency.  Respondent contends that as a matter of law the

evidence before Supreme Court was not sufficient to show, by clear and convincing evidence (see MHL § 10.07 [f]), that he required confinement pursuant to Mental Hygiene Law article 10. We agree.

To begin, the standards applicable in a proceeding seeking confinement pursuant to Mental Hygiene Law § 10.11 (d) (4), after an alleged SIST violation, are the same as those applicable when the proceeding is brought while the sex offender is still incarcerated.  "The court shall make its determination of whether the respondent is a dangerous sex offender requiring confinement in accordance with the standards set forth in subdivision (f) of section 10.07" (Mental Hygiene Law § 10.11 [d] [4]).  Section 10.07 in turn relies on the definitional provisions of Mental Hygiene Law § 10.03.

The Mental Hygiene Law defines "mental abnormality" as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (MHL § 10.03 [i] [emphasis added]).  By contrast, a "dangerous sex offender requiring confinement" is defined in the Mental Hygiene Law as "a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control

behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (MHL § 10.03 [e] [emphasis added]).  The statute – which goes on to describe a "sex offender requiring strict and intensive supervision" as a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement" (MHL § 10.03 [r]) – clearly envisages a distinction between sex offenders who have difficulty controlling their sexual conduct and those who are unable to control it.  The former are to be supervised and treated as "outpatients" and only the latter may be confined.

The testimony in this case tended to show only that respondent was struggling with his sexual urges, not that he was unable to control himself.  Dr. Etu testified that respondent was "having difficulty" with warding off urges to have sex with very young girls, but not that he was unable to do so.  In fact, Dr. Etu recounted certain practical "tools" that respondent successfully used "to control [his] urges."  He would force his attention away from young girls he encountered or remove himself from their vicinity.  The fact that respondent had difficulty warding off illicit sexual urges shows that respondent suffered at the time from "mental abnormality" within the meaning of Mental Hygiene Law article 10, which he does not now deny.  But more than this – the inability to control sexual misconduct – would have had to be shown to prove that respondent was a

dangerous sex offender requiring confinement.[4]

Notably, the record reveals nothing relevant to the issue of respondent's sexual control that occurred between November 15, 2001, when Supreme Court imposed SIST rather than civil confinement, and April 19, 2012, when Supreme Court ordered confinement. What happened during this time was that respondent lost his job, and was evicted from his apartment for failure to pay rent; was late for one appointment; expressed, perhaps with some sarcasm, his distaste for SIST; was discharged from a job application program, with the result that he was evicted from transitional housing; and was discharged from a sex offender treatment program. Whatever else might be said about the personality traits or the social circumstances that led respondent so inexorably to homelessness and then to confinement, they do not give any support to the proposition that he had become unable to govern his sexual conduct.

We conclude that the evidence, considered in the light most favorable to the State, was insufficient to support the trial court's finding that respondent had such an inability to control his behavior that he was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility. Consequently, reversal is required, and it is unnecessary for us to consider respondent's due process

---

[4] The expert testimony did not adequately connect the so-called "static and dynamic risk factors" to the conclusion that Michael M. was unable to control his sexual conduct.

arguments.

The order of the Appellate Division should be reversed, without costs, and the matter remitted to Supreme Court for further proceedings in accordance with this opinion.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, without costs, and matter remitted to Supreme Court, Niagara County, for further proceedings in accordance with the opinion herein.  Opinion by Judge Pigott.  Chief Judge Lippman and Judges Smith, Rivera and Abdus-Salaam concur.  Judge Read dissents and votes to affirm for reasons stated in the memorandum at the Appellate Division (103 AD3d 1113 [2013]).

Decided December 17, 2014