Matter of State of New York (D.M.)

2026 NY Slip Op 02225

April 14, 2026

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

In the Matter of State of New York, Petitioner-Respondent,

v

D.M., Respondent-Appellant.

Decided and Entered: April 14, 2026

Index No. 42056/21|Appeal No. 5352|Case No. 2024-05872|

Before: Manzanet-Daniels, J.P., Gesmer, González, Shulman, O'neill Levy, JJ.

Marvin Bernstein, Mental Hygiene Legal Services, New York (Naomi M. Weinstein of counsel), for appellant.

Letitia James, Attorney General, New York (Blair J. Greenwald of counsel), for respondent.

[*1]

Order, Supreme Court, Bronx County (Tara A. Collins, J.), entered August 23, 2024, which granted the petition to revoke respondent D.M.'s prior release into the community under strict and intensive supervision and treatment (SIST) and ordered him to be civilly committed at a secure treatment facility, and bringing up for review an order, same court and Justice, entered August 7, 2024, which, after an evidentiary hearing, found respondent to be a dangerous sex offender requiring confinement under Mental Hygiene Law article 10, affirmed, without costs.

In 1977, when respondent was 23 years old and on parole supervision for a robbery conviction, he pleaded guilty to first-degree rape of a seven-month-old infant and was sentenced to a prison term of 8 to 16 years imprisonment. In 1986, while still on parole after serving eight years for the prior offense, respondent committed an article 10 qualifying sex offense. He was convicted of two counts of sexual abuse in the first degree and one count of attempted sexual abuse in the first degree for his abuse of two boys, a 9 year old and a 13 year old, and he was sentenced to two terms of 3½ to 7 years, to run consecutively. During his incarceration, respondent accumulated 26 disciplinary tickets for moderately severe (Tier II) and highly severe (Tier III) violations of prison rules. Two of the Tier III violations involved sexual conduct by respondent— one for his making of unwanted sexual advances, kissing, and grabbing the buttocks of other inmates, and the other for consensual, though prohibited, sexual behavior with another inmate. Also noteworthy, although never charged, is respondent's admission of having a sexual relation with a 14-year-old female when he was 22 years old, which resulted in a child.

In November 2009, as respondent approached his release date, the Office of Mental Hygiene (OMH) conducted an article 10 evaluation, diagnosed him with pedophilic disorder and antisocial personality disorder (ASPD), and filed a petition for civil management. The court eventually committed respondent to a secure OMH facility, and an order of continued confinement was issued in April 2019.

[*2]

On October 15, 2021, following an annual review hearing, Supreme Court found that respondent continued to suffer from a mental abnormality but was not then a dangerous sex offender requiring confinement. Thus, the court ordered respondent, who by then was 68 years old, to be released from the secure facility to the community under a SIST regimen. The SIST order incorporated numerous conditions of release, including the requirements that respondent complete sex offender treatment which required respondent to attend the program regularly, participate fully, and not miss scheduled appointments. In addition, the SIST order required respondent to comply with conditions prohibiting contact with children, possession of photographs of children and any unapproved cell phones, and access to social networking websites that allow minors to register, without the permission of his parole officer. Respondent was also required to wear a functioning GPS tracking monitor. Finally, the order memorialized respondent's acknowledgment that any violation of the SIST terms or conditions could result in the modification of SIST conditions or imposition of civil confinement.

Respondent repeatedly — and flagrantly — violated the SIST conditions. Respondent's parole officer filed seven incident reports for violation of SIST conditions while respondent was in his sex offender treatment program with New York Mental Health between December 2021 and December 2022.

Respondent had prohibited contact with minors on multiple occasions. A December 2021 SIST incident report, issued two months after respondent's release into SIST, states that respondent had prohibited contact with a minor female at the church he attended, gifting her a painting he had made. A June 2022 report states that respondent told his sex offender treatment provider that he had contact with a 16- or 17-year-old female — specifically, helping her find a lost wallet. When he discussed this incident with his parole officer, however, he admitted that the child was around 11 or 12 years of age. Respondent reported feeling happy about his incident "because he did something good," demonstrating an acute lack of awareness as to how this incident violated his SIST prohibition against contact with minors and "minimized the extension of his deviant sexual history against minors."

Respondent had further prohibited contact with minors using social media. A February 2022 incident report showed that he had obtained a Facebook account through another shelter resident, and that many of his Facebook friends appeared to be underage and residing in other countries. A review of respondent's private message chats revealed a conversation with and a photo of what appeared to be an underage boy. Respondent denied using social media applications when confronted by his parole officer and accused other shelter residents for the Facebook app's presence on his phone, despite his name and email addresses being attached to the Facebook account.

[*3]

Respondent also possessed prohibited cell phones and images of minors. His April 2023 treatment Monthly Discussion Guide indicates that he possessed a cell phone that he allegedly "found" with a picture of a female child who appears to be between the ages of 9 and 10 years of age on the lock screen; he stated that he was holding the phone "to see if it gets a call so he can return it." The next month, when confronted by his treatment provider about possessing another unauthorized cell phone, he denied having ever possessed it before ultimately surrendering it to his parole officer. Respondent's August 2023 Monthly Discussion Guide shows that he was found to be in possession of another unapproved cell phone, which contained pictures of children. Respondent claimed both to have been given the phone by another resident and to have "found" it. The following month, respondent's parole officer confiscated another unauthorized cell phone from respondent.

Respondent also repeatedly tampered with his GPS tracking device. An incident report shows that in December 2021, shortly following his release into SIST, defendant broke and removed his device. A February 2022 report states that respondent tampered with and loosened the device and denied having done so to his parole officer, and a September 2022 report shows that, after the device was temporarily removed to allow respondent to treat a rash, respondent repeatedly failed to wear the tracking component of his GPS device, so that he was not being tracked. Respondent's June 2023 Monthly Discussion Guide shows that he "no longer had" his GPS charger, and the following month's Guide reported that his GPS battery had died on multiple occasions.

Respondent's July 2023 Monthly Discussion Guide also stated that he violated curfew on multiple occasions, leaving the SIST shelter for approximately 40 minutes at a time. Respondent failed to provide his parole officer with an explanation as to why he violated curfew or where he went during his absconding.

Respondent made numerous remarks of a quasi-sexual nature towards shelter staff and his treatment providers throughout his SIST supervision. His April 2023 Monthly Discussion Guide reports that he repeatedly told a treatment staff member that she was beautiful and asked for a picture of her so he could paint her. Respondent's July and September 2023 Monthly Discussion Guides indicate that he continued telling female staff that they were beautiful.

Respondent also engaged in plainly sexual behavior while under SIST supervision, as he sexually propositioned a much younger male treatment patient, whom he characterized as "young" and needing "help . . . out of his shell" and whom he would meet in the elevator so "others don't know [respondent] spends time with him."

[*4]

Finally, respondent failed to complete his mandated sex offender treatment program. Respondent's incident reports and Monthly Discussion Guides are replete with voluminous instances of respondent skipping treatment sessions (sometimes for weeks at a time) and leaving sessions early, exhibiting combative behavior and failing to participate and engage in the treatment sessions he did attend, refusing to discuss his past sexual offenses, falsely reporting treatment attendance to his parole officer, refusing to assume responsibility for his SIST violations, engaging in "grievance thinking" (that his treatment providers were only there to send him back to jail), violating his behavior contracts, and failing to demonstrate any insight as to the problematic nature of his behavior in light of his past sexually deviant behavior.

Respondent's performance was so poor that he was expelled from his first treatment program, New York Mental Health Group, in December 2022, and given a second chance with another program, RevCore, from which he was also expelled. Thus, in October 2023, the Department of Corrections and Community Supervision issued an incident report stating that respondent had been discharged from RevCore for missing 19 of his individual and group therapy sessions in a 10-month period.

An OMH psychologist, Dr. Jonathan Miljus, conducted an article 10 psychiatric evaluation of respondent, diagnosing him with pedophilic disorder and ASPD and opining that he required confinement at a secure OMH facility. Dr. Miljus's determination was based on, among other things, the reports and Monthly Discussion Guides from his treatment programs, parole records, and discussions with respondent's parole officer and sex offender treatment provider. Dr. Miljus also based his determination on a phone interview with respondent, during which respondent stated that "incarceration was enough treatment for him," and that "he has no current issues to work [on] in treatment," and denied both his noncompliance with SIST and his negative behaviors. Dr. Miljus administered the Static-99R sex offender assessment test, which ranked respondent in the "Above Average" risk group for recidivism. He also reviewed the results of the STABLE-2007 and ACUTE-2007 assessment tests administered to respondent while on SIST, both of which indicated that respondent was a high risk for recidivism. Despite respondent's advanced age, Dr. Miljus opined that respondent has continued to "exhibit these rule breaking manipulative, deceitful behaviors well into an age when you would believe that there is a decline." Dr. Miljus was particularly concerned with respondent's SIST violations that involved minors, which demonstrated that respondent is "not aware of how his behavior is indicative of his pedophilic disorder." Dr. Miljus believed respondent's behavior was becoming "more brazen and representative of risk, which is a concern, that makes him increasingly more dangerous and likely to re-offend."

[*5]

Later that month, petitioner State of New York filed the underlying petition for revocation of respondent's SIST release and for his confinement in a secure facility. While Dr. Miljus testified in favor of confinement, a Mental Hygiene Legal Services expert, Dr. Leonard A. Bard, testified in favor of keeping respondent in the SIST program. While acknowledging respondent's host of SIST violations, as well as also scoring respondent as a high risk of recidivism on the Static-99R tool, Dr. Bard testified that respondent is a low risk to reoffend given that he had not acted in a sexual manner "indicative of a loss of control of sexual urges" in the two years he had been released on SIST. Dr. Bard also argued that respondent's failure to complete the sex offender treatment programs was due both to a brain injury suffered while on SIST and a language barrier (respondent speaks Spanish and English).

In granting the petition, Supreme Court credited the opinion of Dr. Miljus over that of Dr. Bard. The court found that respondent had engaged in a pattern of disregarding his mandatory sex offender treatment, despite being given two years' worth of opportunities and accommodations to do so. The court did not credit Dr. Bard's opinions that respondent's purported cognitive impairments were reasons for his failure in the sex offender treatment program, as respondent was otherwise able to keep a schedule and attend and participate in his drug treatment program, see his parole officer, and go to church. The court applied the same reasoning to respondent's alleged language barrier, as respondent was able to communicate in English, including during his evaluation with Dr. Bard.

The court found that respondent's "brazen" violations of the prohibitions from him having contact with children, possessing unauthorized cell phones and photos of children, and having social media accounts, demonstrated that he was not avoiding or managing his risk, making him more likely to reoffend. The court expressed further concern with respondent's expressed belief that a young woman (18 and up) and a 70-year old man could have a healthy romantic relationship, and his admission that he stares at women working out in the gym and believes that they are taunting him and dressing provocatively to entice him. The court also considered respondent's failure to maintain his monitoring devices and his above-average-to high scores on the reoffending risk assessments.

[*6]

The court concluded that respondent willingly failed to participate in sex offender treatment based on his misguided belief that he did not need it, and that there was nothing in the record that led the court to believe that he had gained any insight into his offending behavior or tried to manage his risk. Further, the court observed that while respondent may not have sexually reoffended, it disagreed with Dr. Bard's opinion that none of respondent's SIST violations implicated sexual misconduct. After his release from civil confinement, respondent, a diagnosed pedophile, had multiple unauthorized contacts with minors in person, online, and in photos, and propositioned an adult who looked like a teenager. The court noted, "[i]t is well settled that the State need not await sexual offending before concluding that an offender is unable to control his sexual behavior (see e.g. State v George N., 160 AD3d 28, 31 [4th Dept 2018]), and here the State [had] amply 'demonstrate[d] a persuasive link' between the respondent's nonsexual SIST violations 'and the offender's ability to control his sexual behavior' (State v Anthony R., 228 AD3d 541, 545 [1st Dept 2024])."

The court properly found that petitioner showed by clear and convincing evidence that respondent was a dangerous sex offender requiring confinement (see Mental Hygiene Law §§ 10.07[f], 10.11[d][4]; Matter of State of New York v Michael M., 24 NY3d 649, 658-659 [2014]). The Mental Hygiene Law defines a "dangerous sex offender requiring confinement" as a "person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses,FN1 and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law § 10.03[e]). "'The trier of fact is in the best position to evaluate the weight and credibility of conflicting expert medical and psychiatric testimony'" (Matter of State of New York v Jason H., 82 AD3d 778, 780 [2d Dept 2011], citing Matter of State of New York v Donald N., 63 AD3d 1391, 1394 [3d Dept 2009] and Matter of George L., 85 NY2d 295, 305 [1995]). Under the circumstances presented here, we defer to Supreme Court's determination in this regard (see Jason H., 82 AD3d at 780).

[*7]

We begin by noting that the court was "not limited to considering only the facts of the SIST violations that prompted this revocation proceeding," but was entitled to "rely on all the relevant facts and circumstances tending to establish that respondent was a dangerous sex offender such as his underlying offenses and past SIST violations" (Matter of State of New York v DeCapua, 121 AD3d 1599, 1600 [4th Dept 2014][internal quotation marks omitted], lv denied 24 NY3d 913 [2015]; see also Matter of State of New York v David D, 206 AD3d 481, 485 [1st Dept 2022]["it is the totality of respondent's mental abnormalities, coupled with his history of substance abuse, impulsivity, lack of remorse or acceptance of his crimes, scores on the risk assessment instruments administered, and lack of sex offender treatment, that evinces respondent's predisposition to commit sex offenses without the ability to control his sex offending conduct"]). Further, regardless of whether SIST violations were sexual in nature, "'they remain highly relevant regarding the level of danger that [respondent] poses to the community with respect to his risk of recidivism'" (Jason H., 82 AD3d at 780, quoting Donald N., 63 AD3d at 1394).

Dr. Miljus's testimony establishes that both respondent's pedophilic disorder and ASPD are chronic, lifelong conditions that manifest in respondent's persistent rule breaking, manipulative, and deceitful behaviors despite his advanced age. Specifically, ASPD is characterized by deceitfulness, impulsivity, repeated criminal behavior, irresponsibility, aggression, and reckless disregard for the safety of others. Sex offender treatment, while not eliminating pedophilic disorder completely, helps individuals control their urges to sexually offend against children and learn to manage risks while in the community.

Respondent's history of horrific pedophilic offenses, both of which were committed while he was on parole, and his violation of prison rules while incarcerated, together with his utter disregard for sex offender treatment throughout his two-year release into SIST, his myriad violations of SIST conditions regarding contact with and possession of photos of minors, and continued inappropriate interactions with treatment staff and clients demonstrate that he has no interest in controlling his pedophilic urges and remains a danger to reoffend.

[*8]

Respondent's continued pedophilic behavior is paired with his failure to discuss or accept responsibility for both his past sexual offenses and SIST violations, persistent unwillingness to attend treatment sessions, repeated attempts to evade GPS tracking and curfew, and blaming of his treatment staff for his noncompliance. Respondent's expulsion from two separate treatment programs demonstrate that he is not willing to partake in, let alone benefit from, sex offender treatment, and his SIST violations have become only more "brazen." We agree with the court's conclusion that, despite his advanced age, respondent remains a dangerous individual who will sexually reoffend if not committed to a secure facility.

Finally, our previous holding in Matter of State of New York v Anthony R. (228 AD3d 541 [1st Dept 2024]) upon which respondent and the dissent rely, does not compel a different result, as it is wholly distinguishable from this case. Specifically, the respondent in Anthony R., who was diagnosed with schizoaffective bipolar disorder and antisocial personality disorder, had previously lived in and complied with SIST for five years before his medication and mental health treatment plans were altered upon the onset of the COVID pandemic, after which he lapsed into aggressive behavior (id. at 542). After a temporary confinement, the respondent was again released under SIST despite receiving ineffective psychiatric care prior to his release, as he was medication noncompliant and exhibiting psychotic behaviors at the time of his release (id. at 543). Within three days of his release, he was taken back into custody for missing curfew, appearing late for sex offender treatment, and testing positive for substance abuse (id.). After giving a detailed history as to how his mental health treatment providers had utterly failed him, we held that the respondent was not a dangerous sex offender requiring confinement because the petitioner did not causally link the respondent's substance abuse or aggressive behavior to any sexual behavior or compulsion during his three-day release in SIST (id. at 545-546).

The facts here are inapposite. First, respondent does not have a five-year history of SIST compliance like the respondent in Anthony R. As we have exhaustively detailed, respondent has not complied, or even showed any interest in complying, with sex offender treatment. Second, Anthony R.'s SIST violations were not of a sexual nature and did not bear any discernible relationship to his underlying crime, the rape of a 64-year-old woman (id. at 542). Here, respondent's SIST violations are indisputably reflective of his pedophilic disorder, as they involve his secretive, calculated, and prohibited interaction with minors, as well as photographs of them. Second, respondent's sex acts in prison, his proposition of the "young" client at his sex offender treatment center, and his repeated verbal advances towards treatment staff are all of a sexual nature.

[*9]

We have considered the remaining arguments and find them unavailing.

All concur except Gesmer, J. who dissents in a memorandum as follows:

Gesmer, J. (Dissenting)

I respectfully dissent. While there is no doubt that the crimes respondent D.M. committed in 1977 and 1986 were heinous, that is not the question before this court. Instead, the question we must consider is whether there is clear and convincing evidence that respondent presently suffers "from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he [is] likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Matter of State or New York v Michael M., 24 NY3d 649, 653 [2014]; Mental Hygiene Law § 10.07[f]). I do not believe that petitioner State of New York met its burden to demonstrate that respondent meets these criteria and thus requires confinement. Therefore, I would reverse and remand the case to Supreme Court for further proceedings.

Article 10 confinement is an extraordinary remedy that should not be taken lightly because it "threatens a liberty interest of the highest order" (Matter of State of New York v Floyd Y., 22 NY3d 95, 105 [2013]; Mental Hygiene Law § 10.01[b] ["[i]n extreme cases, confinement of the most dangerous offenders will need to be extended by civil process"]). Accordingly, the burden placed on the State is demanding. The State "has the burden to establish by clear and convincing evidence that the respondent meets the statutory definition of a dangerous sex offender requiring confinement" (Floyd Y., 22 NY3d at 105; see Mental Hygiene Law § 10.07[d]). I would find that the State has failed to make the requisite showing in this case.

[*10]

As both the Court of Appeals and this Court have held, the Mental Hygiene Law draws a clear distinction between a sex offender requiring "strict and intensive supervision and treatment" (SIST) and a "dangerous sex offender requiring confinement" (see Michael M., 24 NY3d at 652, 659; Matter of State of New York v Anthony R., 228 AD3d 541, 544 [1st Dept 2024]). In order to impose SIST requirements, the State must show that defendant has a "mental abnormality," defined as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03[i] [emphasis added]). By contrast, a "dangerous sex offender requiring confinement" is defined in the Mental Hygiene Law as "a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (Mental Hygiene Law § 10.03[e] [emphasis added]). Therefore, "[a] mere tendency to engage in risky or socially undesirable conduct—even if that conduct provides an opportunity for, or increases the likelihood of, sexual offending" or "mere struggling with sexual urges" are "quintessentially insufficient to establish inability" to control sex offending behavior (Anthony R., 228 AD3d at 545 [quoting Matter of State of New York v George N., 160 AD3d 28, 31 (4th Dept 2018)]). Where, as here, there is no evidence of sexually inappropriate conduct while on SIST, it is "incumbent on the State to demonstrate a persuasive link between a nonsexual SIST violation and the offender's ability to control his sexual behavior" (Anthony R., 228 AD3d at 545[quoting George N., 160 AD3d at 31]).

In this case, I would find that petitioner's evidence, including the evidence demonstrating respondent's violation of the SIST conditions requiring his participation in a sex offender treatment program and requiring him to stay away from children, does not show that, as of 2023, respondent was "unable to control" his sexual conduct (see Michael M., 24 NY3d at 659; Anthony R., 228 AD3d at 545).

[*11]

Respondent was born in about 1953 and is now approximately 73 years old.FN2 He has been convicted of two sexual offenses. He committed the first in 1977, when he was approximately 24, and the second in 1986, when he was approximately 32. As a result of these convictions, and the consequent proceedings pursuant to article 10 of the Mental Hygiene Law, respondent spent almost all of his adult life, from mid-1977 to the present, in prison, jail, or a secure facility. During his incarceration, respondent successfully completed sex offender treatment. He resided in the community only from about July 2021 to October 2023.

The majority finds "noteworthy" that, at the time of respondent's first offense when he was approximately 24, he had been living for two years with a 16 year old with whom he had a child. While I share my colleagues' concern about this almost certainly unlawful situation, neither of the experts who examined respondent in connection with his 2020 discharge petition considered this factor to be relevant to whether he was a dangerous sex offender requiring confinement. The State's expert, Dr. Allison T. Prince, found that respondent remained a dangerous sex offender requiring confinement, but did not list respondent's cohabitation with the teenager as a factor supporting her finding. Similarly, Dr. Matthew Fabian, an independent examiner who also evaluated respondent at that time, was "not concerned" about this aspect of his life, "as [living with a young woman] would not be consistent with any psychiatric disorder or sexually deviant disorder."FN3

The majority also makes much of the disciplinary tickets issued to respondent while he was incarcerated from 1986 to 2009. Only two of these were sexual in nature: a 2002 ticket for making sexual gestures toward three other inmates; and a 2006 ticket for engaging in consensual sexual activity with another inmate.

In anticipation of respondent's completion of his criminal sentence in 2009, respondent was evaluated and diagnosed with pedophilic disorder and antisocial personality disorder (ASPD). After further proceedings, the court directed that respondent be civilly confined in a secure facility. During the next 12 years, respondent did not receive any disciplinary tickets, sexual or other otherwise.

On October 15, 2021, after a hearing, the court determined that respondent continued to suffer from a mental abnormality, but that he was no longer a dangerous sex offender requiring confinement. Among the evidence that the court considered was his lack of a disciplinary record during the preceding 12 years. Accordingly, the court terminated respondent's civil confinement and released him into the community with a SIST plan. Respondent remained on SIST for approximately two years before the State filed the civil confinement petition now before us.

[*12]

In October 2023, respondent's parole officer issued an incident report alleging that respondent had violated the SIST condition requiring him to comply with and complete sex offender training. The report noted that he had been discharged from one treatment program in December 2022 because he had missed sessions earlier in the year. He was assigned to another treatment program that discharged him on October 4, 2023 for missing sessions. As a result, respondent was taken into custody for violating the conditions of his SIST release requiring his attendance and full participation in sex offender treatment.

On October 19, 2023, the State filed the petition now before us, seeking a determination that respondent is a dangerous sex offender requiring confinement. The State's petition is predicated on respondent's alleged failure to complete sex offender treatment as required by his SIST program.FN4

In their evaluations of respondent prepared in connection with the instant petition, both the State's expert, Dr. Miljus, and respondent's expert, Dr. Leonard A. Bard, diagnosed respondent with pedophilic disorder. Dr Miljus also diagnosed respondent with ASPD. Dr. Miljus concluded that respondent "is a dangerous sex offender requiring confinement based upon his diagnoses of [ASPD] and pedophilic disorder." His conclusion hinges in large part on his determination that respondent's SIST violations, and, in particular, his failure to complete sex offender treatment, were volitional. It appears that Dr. Miljus adopted the conclusion of parole officer Lisa Covington that respondent's failure to attend sex offender treatment was not the result of any cognitive difficulty, because he "was capable of keeping many of his scheduled activities like going to church." However, it is undisputed that respondent's church was located close to his residence, while his sex offender treatment program was in a different borough that required lengthy travel by public transportation.

Moreover, Dr. Miljus's conclusion that respondent's failure to attend sex offender treatment meetings was volitional disregards the evidence in the record that respondent's SIST team observed that respondent was exhibiting clear signs of cognitive decline following a brain bleed he suffered approximately four months after being released into SIST. Despite this, they failed to provide respondent with case management services or have him complete a cognitive evaluation, even though respondent had to travel by himself from the Bronx to Manhattan or Brooklyn to attend sex offender treatment sessions required by his SIST plan, and any lateness resulted in his being marked "absent." Strikingly, when respondent was late, he asked to attend a different group but was not permitted to do so. Dr. Miljus acknowledged each of the following facts.

[*13]

As early as October 2021, the staff in the shelter where respondent lived reported that respondent got lost daily and needed help getting to his appointments. In November 2021, respondent was referred for case management services by his SIST team. However, there is no evidence he ever received case management services. In January 2022, respondent experienced the brain bleed and hospitalization. Respondent's SIST team then recommended that he be evaluated for cognitive deficiencies and referred him for a cognitive evaluation. However, the appointment had to be rescheduled due to issues at the medical office unrelated to respondent. Although none of the members of the SIST team was qualified to determine whether respondent suffered from cognitive difficulties, the SIST team decided not to make a subsequent neurological evaluation appointment for respondent and he never received a cognitive evaluation or treatment recommendations.

The trial court adopted Dr. Miljus's view, and further found that respondent also "had no problem" attending meetings with his parole officer. However, Dr. Miljus admitted that, as of October 21, 2021, arrangements had been made for someone to bring respondent to his parole officer meetings because his residence staff reported that he got lost "daily." The trial court also found that respondent had "no problem" attending his drug treatment program. However, Dr. Miljus's report indicates that respondent's attendance at his substance abuse treatment program was "poor." Dr. Miljus also noted that respondent often had difficulty understanding his questions during his interview of him, which lasted less than 80 minutes. This is consistent with Dr. Bard's observation that respondent was much less able to respond to questions when he interviewed him in 2024 than he was during his prior interview of him in 2015.FN5

There is also no evidence in the record that respondent was unable to control his sex-offending behavior while he was living in the community. At most, the relevant evidence shows that respondent was struggling with his sexual urges at that time. In fact, none of the SIST incident reports relied upon by the State alleged inappropriate sexual behavior by respondent. Even Dr. Miljus noted in his report that "[t]here is insufficient evidence to conclude that [respondent] has been recently sexually preoccupied" or that he "holds attitudes that support sexual offending" and there is no indication that respondent "presents with significant behavioral impulsivity."

[*14]

The record also demonstrates that respondent's SIST team was aware that he had difficulty understanding English, which is not his first language. Nevertheless, he was placed only in English-language treatment programs. Respondent's first language is Spanish. He moved to New York at age 18 but learned English only when he was incarcerated. Respondent told members of his SIST team that he sometimes did not understand what people were saying. Nevertheless, respondent was never enrolled in Spanish-language treatment. At the hearing on the subject petition, although respondent often responded in English, he used a Spanish interpreter. Dr. Bard testified that, while respondent may have spoken sufficient English to be interviewed in English for his evaluation, treatment requires a higher level of comfort with expressing oneself and listening, particularly in a group treatment setting, where participants need to feel comfortable sharing and bonding with group members in order to benefit.

In view of respondent's apparent cognitive and language difficulties and the State's failure to have him cognitively evaluated, provide case management services, or place him in a Spanish-language treatment program, I disagree with the majority that we can find on this record that he was given "two years' worth of opportunities and accommodations" to successfully complete sex offender treatment.

I also disagree with the majority that the State "demonstrate[d] a persuasive link" between respondent's nonsexual SIST incident reports and a present inability to control his sexual behavior (Anthony R., 228 AD3d at 545). Indeed, in Anthony R., this Court found that Mr. R's "disquieting" aggressive behaviors toward female staff, angry outbursts during his psychological evaluation, substance abuse, lack of transparency about violations of curfew, apparent nonchalance concerning his underlying offense, failure to exhibit a desire to make progress in sex offender treatment, and late appearance for sex offender treatment, all while on SIST, were insufficient to demonstrate a present inability to control sexual behavior (id.).

[*15]

Here, the incidents that the majority focuses on as a basis for respondent's reincarceration, other than his failure to complete sex offender treatment, were almost all self-reported by respondent, and none involved sexual behavior with minors. The incident reports about several self-reported interactions respondent had with minors in person or online did not suffice to revoke the SIST release. Even if petitioner had demonstrated that these incidents were more than merely incidental interactions, they are not alleged to have involved any actual sexual contact or content. Rather, the incidents suggest at most that respondent struggled with sexual urges or a tendency to engage in risky or socially undesirable conduct. This Court has previously found that such activity does not, on its own, show an inability to control behavior (see Anthony R., 228 AD3d at 545). Strikingly, his earlier criminal incidents occurred while he was using drugs and alcohol, while there is no evidence that he used either while in the community on SIST.

While the majority attempts to distinguish Anthony R. from this case factually,FN6 the principles enunciated by our Court and by the Court of Appeals apply in every case: engaging in "risky or socially undesirable conduct," including conduct that may provide an opportunity for, or increase the likelihood of, sexual offending, "is quintessentially insufficient to establish" a present inability to control behavior (id. [internal quotation marks omitted]; see also Michael M., 24 NY3d at 658-659 [termination from sex offender program, hostility toward therapy and other nonsexual SIST violations insufficient to demonstrate present inability to control behavior and need for confinement]). Similarly, a respondent's mere struggling with sexual urges is insufficient to show inability to control behavior (Michael M., 24 NY3d at 659; Anthony R., 228 AD3d at 545).

Accordingly, I would vote to reverse and remand to Supreme Court to modify the SIST order to address respondent's cognitive needs, for example, by adding case management and transportation services and supervised housing, as was recommended by his expert (see e.g. Matter of State of New York v A.A., 238 AD3d 651, 652 [1st Dept 2025], lv denied 44 NY3d 909 [2026]; see also Matter of State of New York v Nelson D., 22 NY3d 233, 238-239 [2013]; Matter of State of New York v Mahwee S., 232 AD3d 1325, 1326 [4th Dept 2024], lv denied 43 NY3d 902 [2025]).

THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: April 14, 2026

Footnotes

Footnote 1: It is undisputed that respondent suffers from a "mental abnormality" as relevant for this analysis.

Footnote 2: The record has some inconsistences as to respondent's age. For simplicity, I will adopt the dates and ages used in the decision on appeal.

Footnote 3: The diagnostic criteria for pedophilic disorder includes sexual urges or behaviors involving sexual activity with a prepubescent child "generally age 13 or younger" (Diagnostic and Statistical Manual of Mental Disorders 5 at 697).

Footnote 4: As the majority notes, while respondent was living in the community, his parole officer filed seven incident reports alleging that he had violated SIST conditions. However, none of these incidents involved sexual activity, and none of them were alleged as the basis for his reincarceration or the State's confinement petition. According to the report of Dr. Jonathan Miljus, the State's expert, the incident reports alleged that respondent violated SIST conditions as follows: in December 2021, (1) respondent gave a painting he made to a 17-year-old girl at his church; and (2) had a broken GPS device that respondent told his parole officer had fallen off; in February 2022, (3) he disclosed to his parole officer that he had a Facebook account, which, when examined by the parole officer, showed that respondent had nonsexual communication with some people outside of the United States who appeared to be underage; and (4) he reported to his parole officer that his alcohol monitoring device was loose but denied having tampered with it; in June 2022, (5) respondent reported to his sex offender treatment provider that he had helped an underage girl locate her wallet and gave her $10; in October 2022, (6) respondent was not in possession of part of his GPS device; and in December 2022, (7) respondent was discharged from his first sex offender treatment program at the New York Mental Health Group for missing treatment sessions. As stated above, respondent's discharge from a second sex offender treatment program at RevCore was the subject of the October 2023 incident report, which led to his reincarceration and the State's instant petition for confinement.

Footnote 5: While the majority states that the trial court "credited the opinion of Dr Miljus over that of Dr. Bard," the court in fact found that "both doctors testified credibly."

Footnote 6: I disagree with my colleagues in the majority that SIST violations by respondent in Anthony R. "did not bear any discernible relationship to his underlying crime." Mr. R. had raped a 64-year-old woman in the process of robbing her. His SIST violations included "accessing and watching pornographic materials on his phone, taking photographs of women in the subway without their consent and aggressively approaching women for money" (Anthony R., 228 AD3d at 542). As discussed above, I also view the evidence in this case of respondent's unaddressed cognitive difficulties as not dissimilar to Mr. R.'s inadequately treated schizoaffective bipolar disorder (id. at 543), a factor that should have been considered as part of the totality of the circumstances here, as it was in Anthony R. My colleagues also point to Mr. R's years of release on SIST during which he was compliant. However, Mr. R., unlike respondent in this case, was properly evaluated and treated during those years, and it was only after treatment changed and lapsed during COVID that Mr. R. violated SIST conditions (id. at 542). Here, respondent was never evaluated or treated for cognitive decline, despite his SIST team's recognition of his difficulties.